UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:16-cv-81243-ROSENBERG/HOPKINS

AUDREY BOYD,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## MEMORANDUM OPINION

**THIS CAUSE** is before the Court following the non-jury trial held on September 19, 20, 22, and 25, 2017. This case arises from an accident between Plaintiff Audrey Boyd and Karen DeLuca, a mail carrier with the United States Postal Service ("USPS"). At the time of the accident, Ms. Boyd was on foot and Ms. DeLuca was driving a postal service truck. Ms. Boyd filed this negligence action against the United States of America pursuant to the Federal Torts Claims Act, alleging that Ms. DeLuca's negligence caused the accident. *See* DE 1 (Complaint). The United States of America contests liability, causation, and the amount of damages sought by Ms. Boyd. *See* DE 8 (Answer).

### I. INTRODUCTION

The Court first summarizes the background facts before delineating the specific factual findings of the Court.

**A.**     **The Parties**

Audrey Boyd is a sixty-two-year-old resident of West Palm Beach, Florida. **Trial Tr. Vol. 1 at 10:10–18**. At the time of the accident, Ms. Boyd was sixty years old and employed at a daycare. *Id.* **at 11:8–12:11**. She still works in daycare, but at a different facility. *Id.* Ms. Karen

1

DeLuca is a letter carrier with the U.S. Postal Service and has been a letter carrier for twenty-one years. **Trial Tr. Vol. 4 at 3:19–4:18**. Ms. DeLuca drives a right-hand driven long life vehicle ("LLV") to deliver the mail. *Id.* **at 5:9–5:18**. The LLV is equipped with the steering wheel on the right side of the vehicle. *Id.* **at 5:17–19**.

**B.     The Accident**

   **1.   Undisputed Facts**

On May 13, 2013, Ms. DeLuca was on her first day on a new delivery route. *Id.* **at 22:11–12**. At the 2700 block of Broadway Avenue, Ms. DeLuca parked her LLV with the right wheels on the sidewalk and the left wheels on the road. *Id.* **at 12:18–23**. Upon returning to her parked LLV, Ms. DeLuca entered the LLV, *id.* **at 17:10–12**, and backed up, *id.* **at 20:23**.

   **2.   Lay Testimony about the Accident**

      **a.   Ms. Boyd's Testimony**

Ms. Boyd testified that, on May 13, 2013, she was returning from her lunch break to her work at a daycare center. **Trial Tr. Vol. 1. at 13:25–14:14:3**. Ms. Boyd was walking on the sidewalk on Broadway Avenue when she saw the LLV parked on the sidewalk. *Id.* **at 15:24–25**. There was not enough room for her to pass by the LLV on the right side. *Id.* **at 16:14–18**. She walked right up behind the LLV. *Id.* **at 17:23–25**. She either got within two to four inches of the LLV, *id.* **at 42:7–10**, or a little further away from the LLV, *id.* **at 57:20–58:16**. The LLV then backed up into her. *Id.* **at 16:1–2**. The LLV stopped and then backed up into her again. *Id.* **at 16:2–3**. Ms. Boyd never fell to the ground during the incident. *Id.* **at 45:12–13**.

Ms. Boyd testified that she immediately felt pain in her back which shot up to her neck. *Id.* **at 20:4–16**. She had never experienced this type of pain in her back before. *Id.* **at 20:17–19**. Ms. DeLuca got out of the LLV and called 911. *Id.* **at 22:2–6**. Paramedics came to the scene but

Ms. Boyd did not let them examine her. *Id.* **at 22:8–23:7**. The paramedics transferred her to St. Mary's hospital where she saw a doctor and was released. *Id.* **at 23:25–24:11**.

Ms. Boyd testified that she saw a chiropractor the day after the incident. *Id.* **at 25:4–7**. The chiropractor referred her to another doctor, Dr. Roush, who ordered MRIs and injections into her neck and lower back. *Id.* **at 25:10–26:5**. Because the pain in her back returned after the injections, Ms. Boyd saw Dr. Lenard who performed surgery on her lower back. *Id.* **at 28:18–20**.

Ms. Boyd testified that she still has pain and that she can no longer work with the children at the day care in the same way that she previously could. *Id.* **at 37:10–38:8**.

Ms. Boyd testified that she had received various medical bills, *id.* **at 31:4–35:2 & Pl.'s Exs. 14–30**, and that some of her doctors had received letters of protection regarding her treatment, *id.* **at 50:10–51:9**.

### b. Mr. Gregory Brown's Testimony

Gregory Brown was employed by the U.S. Postal Service at the time of the incident and was Ms. DeLuca's supervisor. **Trial Tr. Vol. 2. at 4:22–6:2**. As part of his job as a supervisor, Mr. Brown had to investigate accident scenes. *Id.* **at 6:3–5**. He explained that employees are instructed to immediately contact the post office to report any accidents, *id***. at 6:14–16**, and to ascertain if medical care is needed, *id.* **6:19–21**. Mr. Brown testified that USPS has a kit that is used in investigating the scene of accidents; the kit includes a camera and USPS forms that are to be filed out at the scene. *Id***. at 6:8–13, 7:9–12**. Mr. Brown recalls getting notice of the May 13, 2013 accident. *Id***. 7:18–22**. He testified that when he arrived at the scene, he and the acting supervisor saw the "postal vehicle and Ms. DeLuca outside standing on the sidewalk." *Id.* **at 8:5–8**. Mr. Brown testified that Ms. DeLuca was the only one at the scene when he arrived. *Id.* **at 8:9–10**. The police department arrived maybe 15 minutes later. *Id***. at 8:23–24**.

3

Mr. Brown testified that he walked around the LLV and that he took photographs of the LLV. *Id.* **at 8:14–17**. Mr. Brown testified that the LLV was straddling the curb with "two wheels on the road and two wheels on the sidewalk." *Id.* **at 8:12–13**. Mr. Brown was shown photographs of the LLV which he identified as photographs he had taken on the day of the accident. *Id***. 12:1–11 & Def.'s Ex. C**. Mr. Brown was also shown Defendant's **Exhibits D and E** which he identified as photos of the LLV he had taken on the day of the incident. *Id.* **at 13:17–25**. Mr. Brown testified that the photographs "fairly and accurately depict the scene as it was that day." *Id.* **at 14:6–10**. Mr. Brown testified that, as a USPS supervisor, he would prefer that the letter carriers not park the LLVs straddling the sidewalk but that sometimes happens. *Id***. at 14:18–21**. However, he testified that USPS instructs its drivers not to block driveways and sidewalks. *Id.* **14:22–25**.

Mr. Brown testified that based on his investigation, Ms. DeLuca did not block the sidewalk, *id.* **at 15:2**, and that there was ample room for someone of Ms. Boyd's size to pass on the sidewalk, *id.* **21:17–22:1**. Mr. Brown testified that entry and exit of the LLV must be from the right side of the vehicle and that entry and exit could not be made from the left because "there is a large metal tray that is preventing anyone from exiting or entering on the left side." *Id.* **at 22:2–8**. Mr. Brown agreed that if the LLV was blocking Mrs. Boyd's path on the sidewalk, it also would have prevented the letter carrier from getting out on the right side and delivering the mail. *Id***. at 22:18–21**.

### c. Ms. Deborah Wilcox's Testimony

Deborah Wilcox, Ms. Boyd's daughter, testified that she learned of the event from Ms. Boyd. She did not go to the hospital on the day of the event or for surgery and she did not attend any of Ms. Boyd's doctors' visits. **Trial Tr. Vol. 2 at 124:22–23, 128:8–9, 129:24–25**. Ms. Wilcox testified that her mother had not complained about pain in her low back or neck prior to

the incident, *id.* **at 124:24–125:10,** but now she complains when she moves too fast or stands up or sits down, *id.* **at 131:14–15**. Ms. Wilcox could not think of any hobbies the Plaintiff engaged in prior to the event. *Id.* **at 131:22–132:1–10**. She testified that her mother can no longer sit crisscross apple sauce with the children at the daycare, nor bend or run with them. *Id.* **at 127:12–15**.

### d. Mr. Brian Bartlett's Testimony

Brian Bartlett, employed with the West Palm Beach Fire Rescue as a paramedic for eight years, responded to the 911 call in this case. **Trial Tr. Vol. 3 at 4:5–9**. Mr. Bartlett has responded to as many as 70–90 calls a shift. *Id.* **at 5:5–6**. He relied upon his report to testify as to the events in this matter. *Id.* **at 4:25–7:5**. Mr. Bartlett responded to the incident on May 13, 2013 at 13:14, *id.* **at 6:1–4**, and found Ms. Boyd in "no apparent distress." *Id.* **at 10:6–7**. She was oriented as to place, time, and person. *Id.* **at 9:15–16, 10:4–5**. Ms. Boyd was ambulatory, *id.* **at 7:23–25**, and there were no other complaints other than right hip pain, *id.* **at 10:8–9**. Ms. Boyd did not lose consciousness. *Id.* **at 10:16–19**.

Mr. Bartlett testified that Ms. Boyd "denied any head, neck, back pain, [loss of consciousness] and/or any other injury/illness." *Id.* **at 10:16–17**. Mr. Bartlett testified that Ms. Boyd denied any complaints with respect to her left leg, right foot or left foot and that Ms. Boyd's pulse was normal. *Id.* **at 9:5–16**. According to Mr. Bartlett, while Ms. Boyd stated that the LLV backed into her, and she described the contact as a "bump." *Id.* **at 11:2–4**. Ms. Boyd refused to let the paramedics examine her right hip. *Id.* **at 10:12**. Mr. Bartlett's report was admitted into evidence. *Id.* **at 15:11–12 & Def. Ex. Q**.

### e. Ms. Karen DeLuca's Testimony

Ms. DeLuca testified that she has been working for the USPS for 21 years. **Trial Tr. Vol. 4 at 4:17–18**. During that time, she has never been involved in an accident and her license has

5

never been revoked or suspended. *Id.* **at 9:11–21**. Ms. DeLuca testified about her routine at work. She reports to work and gets ready to deliver the mail, which requires stacking mail into the trays of the LLV. *Id.* **at 10:10–24**. She checks her LLV to make sure that it is in working order and also checks the tires and mirrors. *Id.* **at 10:10–11:3**. During her employment with the USPS, Ms. DeLuca generally has driven the same vehicle. *Id.* **at 11:6:11**.

She testified that on the day of the incident, she parked her vehicle with "the right wheels on the sidewalk. The left wheels were on the highway." *Id.* **at 12:20–23**. Ms. DeLuca testified that she parked the LLV this way so that she would not block street traffic or the sidewalk. *Id.* **at 12:24–25, 13:1–3**. Ms. DeLuca was shown Defendant's **Exhibits C, D and E**. She identified these photographs as depicting the scene on the day of the accident. *Id.* **at 12:11–15**. According to Ms. DeLuca, the photographs show that the LLV was partially on the sidewalk but was not blocking the sidewalk. *Id.* **at 13:19–22, 14:1–3**.

Ms. DeLuca testified that she had received instructions from a previous USPS supervisor on how to park an LLV in this kind of situation. *Id.* **14:22–24**. Ms. DeLuca testified that she was not blocking any traffic on the sidewalk or on the roadway and that the LLV was not parked against the fence that is next to the sidewalk. *Id.* **at 15: 2–7**. Ms. DeLuca testified that, had the LLV been parked against the fence, she would not have been able to get out of the vehicle to deliver her mail. She testified that at no time during that day did she change the position of the LLV and that they remained at all times in the manner seen in Defendant's **Exhibits C, D** and **E**. *Id.* **at 15:8–10**.

Ms. DeLuca testified that when she arrived at the 2700 Broadway, she exited the LLV on the right hand side. *Id.* **15:17–21**. She could not exactly recall her delivery route but stated that upon finishing her deliveries she returned to the LLV. *Id.* **at 16:12–16**. As she approached the LLV, Ms. DeLuca did not see anyone. *Id.* **at 17:24–25**. Ms. DeLuca testified that she re–entered

6

her vehicle through the right hand side, put her seat belt on, checked her mirrors, *id.* **at 17:15–16**, and started the engine, *id.* **17:13:18**. Ms. DeLuca testified that it is her habit to check her surroundings and to check all mirrors, *id.* **17:21–25**, and that she did so on this occasion, *id***. at 17:24–25, 18:1–5.** Ms. DeLuca testified that she backed "off the curb of the driveway" a "little bit" and she heard something. *Id.* **20:10:11, 23:25**. She was unsure if it was a person's voice or some other noise. *Id***. at 21:15–16**. After hearing the sound, Ms. DeLuca stopped the vehicle and put it in park. *Id.* **at 25:3–5**. She then turned the LLV off and got out on the right side. *Id***. at 25:9–11**. Ms. DeLuca testified that there was room for her to get out of the LLV. *Id.* **at 25:12–13, 36:21–25, 36:1–2**. According to Ms. DeLuca, when she got out of the right side of the LLV, Ms. Boyd was coming towards her on the sidewalk. *Id.* **at 25:17–20**, **36:1–2**, **36:21–25**, **38: 23–25**, **39:1–3**. Ms. DeLuca testified that she did not know if she struck the Plaintiff. *Id.* **at 37:3–12**.

### 3. Expert Testimony about the Accident

#### a. Defendant's Expert: Dr. Alan Routman

Dr. Alan Routman testified as an expert on behalf of the United States. Dr. Routman's *curriculum vita* and educational background qualify him as an expert in the field of Orthopedics and the Court accepts and deems him as such for purposes of rendering expert opinions about the issues in this case. **Trial Tr. Vol. 2 at 39:2–24**. Dr. Routman reviewed the medical records, MRI scans, and deposition testimony, and he conducted an independent medical examination of Ms. Boyd. *Id.* **at 40:12–21**. Dr. Routman testified that Ms. Boyd reported that she was "struck on the right arm, she did not fall to the ground, but she noted excruciating pain in her lower back radiating into her right arm and into her neck at the time of the accident." *Id.* **at 41:5–12**. He stated that "the fact that she was struck on her right arm by a truck, she did not fall to the ground, the information suggested a very low velocity impact obviously." *Id.* **at 41:25–2**.

Dr. Routman testified that Mrs. Boyd reported that she had immediate excruciating low pain in her back and neck following the incident but that her medical records do not support that statement. *Id.* **at 43:16–18**. Dr. Routman testified that Ms. Boyd had degenerative disc disease in her lower back and in every level in her neck. *Id.* **at 43:21–24**. He testified that degenerative disc disease develops gradually over many years and that it is not unusual for people beyond the fifth and sixth decades, even asymptomatic people, to show multiple disc levels of degenerative evidence. *Id.* **at 44:2–10**. Dr. Routman testified that in his review of the emergency room records at St. Mary's on May 13, 2013, Ms. Boyd did not complain of pain in the neck, back or spinal areas. *Id.* **at 44:25–45:2**. She complained of pain in the right leg and tingling in the right arm. *Id.* **at 44:24–25**.

Dr. Routman testified that he does not believe the need for surgery was based on any anatomic injury to the lumbar spine that occurred on May 13, 2013. *Id.* **at 54:14–18**. On the day of the event, x-rays were done at the hospital of the upper spine but no x-ray of the lower back; Dr. Routman concluded that no x-ray of the lower back was taken because Ms. Boyd did not present any symptoms there. *Id.* **at 49:2–7**. Five weeks after the accident, Ms. Boyd had MRI scans of her cervical and lumbar spines. *Id.* **at 49:2–7**. According to Dr. Routman**,** these scans showed multi-level degenerative disc disease and arthritis of her spine from the lower back and upper back. *Id.* **at 49:10**. Dr. Routman disputed the contention that there is evidence of a spine injury shown on the MRI. *Id.* **at 49:8–12**. He testified that, if there is evidence of an acute spine injury, there should be evidence of "swelling, edema, hemorrhage, signs of an acute injury to that one level." *Id.* **at 49:13–15**. Dr. Routman testified that **"**[n]one of her imaging studies showed any type of feature to suggest an acute injury at all to her spine." *Id.* **at 49:16–17**.

Dr. Routman testified that his review of the case does not support an injury other than what may have been a bruise to her thigh from bumping the bumper of the LLV. *Id.* **at 50:18–**

8

**21**. He testified that an annular tear is typically not suggestive of a traumatic event, but a part of the degenerative process. *Id.* **at 61:22–24**. Dr. Rotuman does not consider being "bumped" on the leg with a truck to be trauma. *Id.* **at 70:14–15**. Dr. Routman testified that "the predominant determining factor of how a person's body is impacted by a vehicle, depends on the velocity of the vehicle and the forces that were exerted upon it**,** *id.* **at 71: 5–10**, and not the position of a person's body at the time they are impacted, *id.* **at 71:8–10**.

### b. Defendant's Expert: Dr. Andrew Rentschler

Andrew Rentschler, Ph.D., an expert in the field of Biomechanical Engineering testified on behalf of the United States. Dr. Rentschler' s *curriculum vita* and educational background credentialed him as an expert in the field of Biomechanics and the Court deems him as such for purposes of rendering expert opinions about the issues in this case.

Dr. Rentschler testified that he performed a biomechanical analysis with respect to the incident. He testified that his task was to analyze "if the incident produced the correct injury mechanisms, right forces and loading to produce the claimed injuries in the case." *Id.* **at 83:9–12**. Dr. Rentschler testified that in making his analysis, he reviewed deposition transcripts of Ms. Boyd, Ms. DeLuca, Deborah Wilcox, medical records, and photographs of the LLV. *Id.* **at 85:15–20**. Dr. Rentschler testified that because Ms. Boyd did not fall to the ground, he knew that "there was no direct loading to either her lumbar or cervical spine." *Id.* **at 86:9–13**. Dr. Rentschler testified that his analysis is based on the testimony that the LLV hit "her leg and then her shoulder…struck the rear of the truck which would be consistent with the truck slowly backing into somebody. And it was not going very fast; otherwise it would have knocked her over or pushed her over and partially run over her body." *Id***. at 86:16–20**. He testified that there must be "compressive loading, and some sort of bending, either flexion or extension or sideways

bending of the spine, load it with compression and bending of the spine to casual traumatic herniation or bulging of the disc." *Id*. **at 92:1–7**.

Dr. Rentschler testified that he performed a biomedical analysis of Ms. Boyd's case. He looked at the severity of the actual incident, the changes in velocity and acceleration of the impact of the LLV, and the kinematics of Mrs. Boyd's body. He then compared the force exerted on Ms. Boyd to what her body sees on a daily basis to determine if there enough force and applied in the right manner to actually cause traumatic intervertebral disc injuries. *Id*. **at 92:10–20**.

Dr. Rentschler testified that in arriving at the severity of the impact of the rear of the vehicle to Mrs. Boyd, he looked at Delta V or changes in velocity, as well as the acceleration involved, and the G value. *Id*. **at 92:21–24**. Dr. Rentschler concluded that the maximum impact speed was 1.7 miles per hour. *Id.* **at 95:9–22** He arrived at this conclusion by considering that Ms. Boyd stated that she was three to four inches from the back of the LLV and he assumed a maximum acceleration in the rearward direction at 10 feet per second squared. *Id.* The maximum acceleration would involve the driver putting the vehicle in reverse and slamming the pedal to the floorboard. *Id.* He noted that the speed would change to 2 miles per hour if Ms. Boyd was around twelve inches from the LLV rather than three or four inches. *Id.* **105:24–106:1**. Dr. Rentschler testified that the speed had to be very low for the incident to occur the way it was described. *Id.* **at 96:20–25**. Dr. Rentschler testified that 1.7 miles per hour is less than one G, *id.* **96:16–19**, and that "anything she does on a daily basis is going to be greater than one G of acceleration. . . . [T]he acceleration and force exerted on Ms. Boyd's body would be well within her personal tolerance. *Id.* **at 97:11–18**.

Dr. Rentschler testified that that there is not a sufficient force or mechanism to cause the disc injury of which Ms. Boyd complains. *Id.* **at 99:9–10**. Dr. Rentschler testified that there is no

10

compression or vertical loading of the spine, and the force exerted on Ms. Boyd's body was less than one G, which is less than what her body sees on a daily basis. ***Id*. at 99:9–13**.

Dr. Rentschler cited various studies whose purpose is to look at the force produced during certain acceleration. *Id.* **at 116:14–15**. He testified that the purpose of the studies was to "look at the acceleration or the force of daily living, here is the force on the body, whether you have a degenerated spine or a healthy spine, the force is going to be the same." *Id.* **at 116:21–25**. He testified that he was analyzing how the force and acceleration from this incident compared to the force and acceleration of her activities on a daily basis. Dr. Rentschler opined that the described event could not have produced the injuries complained of by Ms. Boyd. *Id.* **at 99:7–13**.

### c. <u>Defendant's Expert: Mr. William Wright</u>

The United States presented expert testimony from William Wright, a retired traffic homicide investigator with a degree in mechanical engineering. **Trial Tr. Vol. 3 at 24:20–25:12**. Mr. Wright has published papers on accident reconstruction topics, teaches, and now runs a private accident reconstruction consulting business. *Id.* **at 25:19–22**.

Mr. Wright used several tools to help him recreate the accident. He testified that he visited the scene, reviewed photographs, and took measurements and photographs at the scene. *Id.* **at 27:7–12**. He testified that he measured the exterior dimensions of an LLV and that he took eleven photographs of the LLV that he measured. *Id.* **at 30: 23–31:11**. Mr. Wright's measurements of the LLV show the relevant length, width, edges and corners, for reproduction in diagram form. *Id.* **at 31:19–21**. He testified that that by using the LLV measurements he was able to diagram and understand the roadway. *Id.* **at 31:24**. Using the measurements of the roadway and the measurement of the LLV, he was able to put them together in a virtual space in a computer program. *Id.* **at 32:1–2**. He testified that by "placing the scaled LLV in the scaled

roadway," he was able to make "judgments how much space there was on the right side of the LLV at the time it was photographed." *Id.* **at 32:5–8**. Mr. Wright did this by using a computer-aided design program ("CAD").

Mr. Wright testified that he imported the measurements in the CAD program and developed a schematic. *Id.* **at 32:10–13**. Mr. Wright testified with specificity about his measurements pertaining to the location and the amount of space between the wall and the curb, the space between the curb and gutter, the location of the tires, width of the LLV, dimensions of the LLV, and the photographs of the LLV taken on the day of the event. *Id.* **at 33:16–25, 34:2–5**. Mr. Wright testified that, based on this information, there was 3.17 feet between the right side of the LLV and the wall. *Id.* **at 34:6–8**. Mr. Wright testified that he "had not seen Ms. Boyd before today, but in his opinion, just as the photographs demonstrate, there is room for people to move there. There is room for Ms. Boyd to walk there." *Id.* **at 41:3–6**. Mr. Wright testified that the LLV was parked partially on the sidewalk. *Id.* **at 54:10**.

With respect to whether a pedestrian would be able to judge how much space there was on the right side of the LLV, Mr. Wright testified that the pedestrian's perception would depend on how they approached the LLV. A pedestrian approaching from some significant distance would clearly see the sidewalk, where the postal vehicle is, and how much space there is on the right-hand side. *Id.* **at 57:18–25**. A pedestrian standing within two to three feet behind the LLV may not be able to appreciate the distance on the right-hand side. *Id.* **at 54:4–8**.

### d. **Plaintiff's Expert: Dr. Alexander Lenard**

Ms. Boyd presented testimony of Dr. Alexander Lenard, a spine surgeon and Chief of Staff and Chief of the Spine Surgery Center at St. Mary's Hospital. *Id.* **at 61:13, 61:24, 62:1**.

Dr. Lenard first examined Ms. Boyd on December 17, 2014. Ms. Boyd presented with low back pain, "neck pain with radiation and tingling down the right arm, and low back pain

12

without radiation." *Id.* **at 67:24–68:4**. Dr. Lenard noted that, although there was variation in the records of Ms. Boyd's complaints, he viewed the variation as normal. *Id.* **at 77:1–22**. Based on his examination of Ms. Boyd and new MRIs that he ordered, Dr. Lenard recommended that Ms. Boyd have surgery on her spine. *Id.* **at 69:19–71:10**. Dr. Lenard testified that he assumed that Ms. Boyd had preexisting degenerative conditions. *Id.* **at 72:25–73:1**. He also testified that a preexisting condition, like stenosis, can make a person more susceptible to injury from minor trauma. *Id.* **at 73:16–21**.

On March 15, 2015, Dr. Lenard performed a decompression procedure of Ms. Boyd's lower lumbar spine, which involved removing bone from the rear of her spinal canal to make room for her nerves. *Id.* **at 71:20–72:7**. Dr. Lenard testified that Ms. Boyd continues to have ongoing issues following the surgery. *Id.* **at 81:21–25**. Dr. Lenard referred Ms. Boyd to a pain management doctor. *Id.* **at 82:11–19**. He also testified that Ms. Boyd could require future surgery on her spine which could cost up to $100,000. *Id.* **at 82:20–83:15**. Dr. Lenard testified that he did not believe that there was any letter of protection for him in this case but that the hospital may or may not have one. *Id.* **at 89:15–19**.

Dr. Lenard testified that he believes Ms. Boyd's injuries were at least exacerbated by the incident because Ms. Boyd did not have a prior record of symptomatology. *Id.* **at 107:20–108:3**. He also noted that radicular symptoms—pain shooting down the arm or leg—is not associated with degenerative change but are usually caused by an acute event. *Id.* **at 109:22–110:3**.

## II. FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. <u>Applicable Law</u>

This action is brought under the Federal Tort Claims Act ("FTCA"). The FTCA is a limited waiver of sovereign immunity for the United States that, with certain exceptions, permits a negligence action against the United States of America to the same extent that such an action

13

would arise against a private individual under like circumstances. *See* 28 U.S.C. § 1346(b)(1). Such claims are governed by the law of the place where the allegedly negligent act or omission occurred. *Id.*

Because the accident at issue in the present case occurred in Florida, Ms. Boyd's claim is governed by Florida law. "To maintain an action for negligence [under Florida law], a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages." *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007). It is undisputed that, as a motorist, Ms. DeLuca owed Ms. Boyd a "duty to use reasonable care on the roadways to avoid accidents and injury to [herself] or others." *Williams v. Davis*, 974 So. 2d 1052, 1063 (Fla. 2007). The disputed elements in the present case are breach, causation, and damages.[1]

"The standard of care applicable to negligence actions under Florida law is one of reasonable care; that which a reasonably careful, prudent, and cautious person would use under the circumstances." *Hensley v. United States*, 728 F. Supp. 716, 721 (S.D. Fla. 1989). Florida has adopted a pure comparative negligence rule which states that "if both the plaintiff and defendant are at fault, the plaintiff can still recover, but his or her recovery is limited to the proportion of the damages that were proximately caused by the defendant's negligence." *Scruggs v. United States*, 959 F. Supp. 1537, 1544–45 (S.D. Fla. 1997). However, "there can be no apportionment of negligence where the negligence of the defendant is not directly a legal cause of the result complained of by the plaintiff. . . . Therefore, a plaintiff is barred from recovering damages where the plaintiff's negligence is the sole legal cause of damages." *Id.*

---

[1] The parties have stipulated that the United States is liable for any negligence committed by Ms. DeLuca because she was acting in the course and scope of her employment with USPS when the accident occurred. *See* DE 49 at 3 ¶ VII(a) (pretrial stipulation); *see also* 28 U.S.C. § 1346(b)(1).

B. **The Parties' Theories of the Case**

Ms. Boyd's theory of the case is that Ms. DeLuca breached her duty of reasonable care in backing up her LLV which made contact with Ms. Boyd. Ms. Boyd testified that the LLV was blocking the sidewalk and that she could not pass the LLV on the right side.

Defendant's theory of the case is that Ms. Boyd is solely at fault for the accident because she acted unreasonably in standing so close to the back of the LLV. Defendant argued that there was sufficient room for Ms. Boyd to pass on the right side of the vehicle. Defendant also argued that, if Ms. Boyd was hit by the LLV, it was at a low velocity and could not have caused her injuries.

C. **The Court's Findings and Conclusions**

To prevail, Ms. Boyd must demonstrate that Ms. DeLuca breached a duty of reasonable care and, in doing so, hit Ms. Boyd and caused her injury. Ms. Boyd suggested that Ms. DeLuca was negligent in both parking on the sidewalk and in backing up into Ms. Boyd. **Trial Tr. Vol. 4 at 34:6–8 at 60:17–61:13**.

The Court does not find the testimony that the sidewalk was blocked by the LLV to be credible. The Court relies on the photos introduced into evidence depicting that there was more than ample space for Ms. Boyd to pass by the LLV on the sidewalk, s*ee* **Exhibits C, D & E**, and Mr. Wright's testimony that there was 3.17 feet between the side of the LLV and the fence, **Trial Tr. Vol. 3 at 34:6–8**. Additionally, the Court notes that the LLV is a right-hand vehicle and that there had to be sufficient room on the right side of the LLV for Ms. DeLuca to enter and exit the LLV. *Id.* **at 15: 5–7**. The Court finds that there was ample space for Ms. Boyd to have proceeded past the LLV on the sidewalk.

The Court does not find that Ms. DeLuca breached a duty of care in backing up the LLV. Although the Court concludes that there was contact between the LLV and Ms. Boyd, the Court

15

cannot conclude that the contact was the result of any breach by Ms. DeLuca. Ms. DeLuca testified that, upon returning to the LLV that day, she checked her mirrors as is her habit, *id.* at **17:15–16**, did not see anyone, and started the engine. *Id.* **17:13–18:5**.

Rather, the Court finds that Ms. Boyd was at fault for getting so close to the back of the LLV. Although Ms. Boyd's testimony changed about how close she was to the LLV, *compare* **Trial Tr. Vol. 3 at 34:6–8 at 42:7–10**, *with id.* **at 57:20–58:16**, the Court concludes it was unreasonable for Ms. Boyd to get so close to the LLV at either distance.

The Court finds no causation between the incident and the subsequent medical treatment and surgery by Ms. Boyd's doctors. The Court finds Dr. Rentschler's testimony about the force exerted on Ms. Boyd to be credible. The Court notes that the maximum velocity Ms. Boyd could have been accelerated was 1.7 miles per hour if she was three or four inches from the LLV, **Trial Tr. Vol. 2 at 95:9–22**, or 2 miles per hour if she was around twelve inches from the LLV, *id.* **105:24–106:1**. According to Dr. Rentschler's testimony, this acceleration was less than the force exerted on Ms. Boyd on a daily basis and that it would be well within her personal tolerance. *Id.* **97:11–18**. The Court notes that this finding is consistent with the fact that Ms. Boyd did not fall down during the incident and, thus, the collision must have occurred at a low speed. *See id*. **at 86:16–20**.

The Court finds the opinion of Defendant's expert, Dr. Routman, as to the cause of Ms. Boyd's injuries to be credible. The Court notes Dr. Routman's testimony that Ms. Boyd had multi-level degenerative disc disease that was not the result of an acute injury. *Id.* **at 49:10–17**. Although Dr. Lenard testified that preexisting conditions can make an individual more susceptible to injury from even minor trauma, **Trial Tr. Vol. 3 at 73:16–21**, his testimony did not offer any evidence to show that Ms. Boyd had any injury caused by trauma rather than

simple injuries caused by her degenerative discuss disease. In fact, Dr. Lenard agreed with Dr. Routman that Ms. Boyd had preexisting degenerative conditions. *Id.* **at 72:25–73:1**.

The Court finds that a comparative negligence analyses is unwarranted in this case because Ms. Boyd failed to prove by a preponderance of the evidence that Ms. DeLuca breached the duty of care and that such breach was the legal cause of the accident. Although Ms. DeLuca parked her LLV partially on the roadway and partially on the sidewalk, there was ample room for Ms. Boyd to pass on the right side of the LLV. Ms. Boyd also did not prove by a preponderance of the evidence that Ms. DeLuca operated the LLV without reasonable care in backing up.

Moreover, the Court finds that the sole cause of the accident was Ms. Boyd getting unreasonably close to the back of the LLV, rather than Ms. DeLuca parking the LLV partially on the sidewalk or backing up. *See Scruggs*, 959 F. Supp. at 1545 ("A plaintiff is barred from recovering damages for loss or injury caused by the negligence of another only when the plaintiff's negligence is the sole legal cause of the damage[.]"). It was unreasonable for Ms. Boyd to get within a foot of the back of the LLV. Further, Ms. Boyd failed to prove by a preponderance of the evidence that this incident caused her any injury. Accordingly, the United States is not liable for any damages Ms. Boyd may or may not have suffered as a result of this incident.

### III. CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that:

1. Plaintiff Audrey Body is not entitled to judgment in her favor on her claim for negligence, and she shall take nothing;

2. Defendant's *ore tenus* Motion for Judgment as a Matter of Law Under Rule 50 is **DENIED AS MOOT**. *See* **Trial Tr. Vol. 3 at 45:18–57:10**;

3. Final judgment will be entered in a separate order;

4. The Clerk of Court is directed to **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 20th day of October, 2017.

_____
Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.